# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

| | | |
|---|---|---|
| MARTHA HOYT, Individually and as | * | |
| Administrator of the Estate of JAMES | * | |
| CHRISTOPHER ALLEN, and JAMES | * | |
| ALLEN, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| BACON COUNTY, GEORGIA, | * | CV 509-026 |
| SHERIFF RICHARD FOSKEY, in his | * | |
| official capacity and individual capacity, | * | |
| BERNARD COOKS, in his individual | * | |
| capacity, THE CITY OF ALMA, GEORGIA, | * | |
| TOM TAGGART, CHIEF OF POLICE, | * | |
| ALMA, GEORGIA, in his official capacity | * | |
| and individual capacity, and RANDY T. | * | |
| HARKLEROAD, in his individual capacity, | * | |
| | * | |
| Defendants. | * | |

## ORDER

Presently before the Court is Defendants' Motion for Summary Judgment on all counts of Plaintiffs' First Amended Complaint. For the reasons set forth below, summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

AO 72A
(Rev. 8/82)

**BACKGROUND**

Early in the morning hours of May 9, 2007, James Christopher Allen ("Allen") called 911 multiple times for assistance at his residence, advising a dispatcher that "demons were trying to get him." Defendant Bernard Cooks of the Bacon County Sheriff's Department was dispatched to Allen's residence, and arrived at approximately 2:16 a.m. Upon his arrival, Allen ran toward Cooks's patrol car, yelling that "demons were trying to get him." The car window was down, and Allen placed his head inside. Cooks drove the car forward in an attempt to shake off Allen, who continued to try to get further inside the car. Allen eventually fell off the car. Cooks, after stopping his vehicle, walked towards Allen and asked how he could help him. Allen replied, yelling that Cooks had to "kill these demons." Cooks asked Allen to calm down. Allen began to crawl toward Cooks, who then returned to his patrol car. Allen continued to crawl toward Cooks while Cooks was in the patrol car, yelling and soaking with perspiration. Cooks advised Allen to get down on the ground. At some point during these events, Cooks requested back-up at 2:17 a.m.

Defendant Randy T. Harkleroad of the City of Alma Police Department was dispatched and arrived at Allen's residence at approximately 2:27 a.m. Cooks told Harkleroad that Allen needed to be handcuffed and transported to the jail. While Allen was

2

lying on the ground, Cooks advised him to place his hands behind his back.  Allen placed only one hand behind his back.  Cooks repeated his instructions.  Allen tried to rise from the ground. Cooks unholstered his taser and again asked Allen to get down and put his hands behind his back.  Allen got down, but again placed only one hand behind his back.

Cooks then discharged his taser into Allen's back.  In an effort to arrest Allen, Cooks and Harkleroad tased Allen at least six times, and possibly as many as eighteen times.  A dispute of material fact between the parties concerns the number of times Defendants tased Allen.  Plaintiffs initially alleged in their Amended Complaint that Defendants tased him at least nine times.  First Am. Compl. ¶ 45, ECF No. 44.  Defendants maintain that they made only "six applications of the tasers." Mot. Summ. J. 7, ECF No. 59-1.  Plaintiffs point out that download data from Defendants' tasers indicate that they may have tased Allen as many as eighteen times.  Resp. 23.  During his deposition, Cooks acknowledged that the taser download data from the Georgia Bureau Investigation (GBI) file — presented to him as a deposition exhibit — stated that his taser was deployed or discharged twelve times.  Cooks Dep. 182:18-22, ECF No. 65-1. Harkleroad, looking at download data for his taser — also presented as a deposition exhibit — acknowledged that the data showed six administrations of the taser.  Harkleroad Dep. 51:14-

16, ECF No. 65-2. Both Cooks and Harkleroad nonetheless maintain that they did not actually fire their tasers twelve and six times, respectively, but could not offer any explanation of why the download data showed numbers higher than that. Cooks Dep. 183:5-7; Harkleroad Dep. 51:23-25. Defendants argue that "taser download data only indicate the number of times that each particular taser was activated," not necessarily how many times the tasers made contact with Allen's skin, and Plaintiffs have conceded this possibility. Reply 12; see also Resp. 18 (citing deposition testimony of John Murray that "[t]aser downloads record[] the number of firings from the taser and the length of the cycle, but [ ] will not show if the taser came into contact with anything"). Nonetheless, Plaintiffs maintain that it is possible that Defendants' tasers made contact with Allen's body as many as eighteen times, and Defendants have admitted the tasers made contact at least six times.[1]

After tasing and finally handcuffing Allen, Cooks placed him in the backseat of his patrol car and transported him to the Bacon County Sheriff's Office and jail. Harkleroad left the

---

[1] Defendant Cooks testified that he tased Allen once in the dart mode and twice in the drive-stun mode. Mot. Summ. J. 7. Defendant Harkleroad testified that he tased Allen only in the drive-stun mode. Id. at 6. The drive-stun mode and dart mode are distinct. In the drive-stun mode, the officer physically touches the taser to the suspect's body, causing temporary, localized pain. In the dart mode, by contrast, the officer shoots darts at the suspect from a distance, causing neuromuscular incapacitation. See Snauer v. City of Springfield, No. 09-CV-6277, 2010 WL 4875784, at *3 (D. Or. Oct. 1, 2010) (citing Brooks v. City of Seattle, 599 F.3d 1018, 1026 (9th Cir. 2010)).

scene at 2:41 a.m., following Cooks in his own vehicle.   During the ride, Allen asked Cooks how long it would take to get to the jail, to which Cooks responded that it would take another minute or so.   Cooks arrived at the jail complex at 2:50 a.m., at which time he found Allen unresponsive.   Cooks went to the fire department to obtain ammonia capsules from an EMT to try to arouse Allen.   Harkleroad attempted unsuccessfully to rouse Allen with the ammonia.[2]   Cooks pulled Allen from the vehicle and checked for a pulse, finding none.   Harkleroad also unsuccessfully searched for a pulse.   They then asked a nearby EMT to check for a pulse.   The 911 log indicates that Defendants requested EMT assistance at 2:56 a.m.   See id.   When the EMT could not find a pulse, Cooks began to administer CPR to Allen.   They requested an ambulance and Allen was taken to the hospital at approximately 3:03 a.m.   At 3:25 a.m., Allen was pronounced dead.   An autopsy report of the Division of Forensic Sciences of the GBI stated "that Allen died as a result of cocaine-induced excited delirium in a background of coronary atherosclerotic disease."   Am. Compl. ¶¶ 60-61, ECF No. 44.

---

[2] There is a factual discrepancy as to whether Harkleroad was actually present at this point.   Compare Resp. 8, 10 (indicating he was present at the jail complex), with Resp. 4 (citing 911 dispatcher's deposition testimony that when Cooks arrived at the jail complex, Harkleroad arrived back in the City of Alma).   For purposes of this motion, the Court will view the facts in the light most favorable to the Plaintiffs — that Harkleroad was indeed present at the jail complex and was aware that Allen was unresponsive.

AO 72A
(Rev. 8/82)

Decedent Allen's parents, both individually and on behalf of Allen's estate, brought suit against Defendants, raising three federal-law claims and three state-law claims. Defendants now move for summary judgment as to all claims.

**SUMMARY JUDGMENT STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue as to any material fact is "genuine" if, from the evidence, "a reasonable jury could return a verdict for the nonmoving party." Id.

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party discharges this burden, the burden then shifts to the nonmoving party to offer affirmative evidence showing that a genuine issue of material fact does exist, requiring a trial. Anderson, 477 U.S. at 257. "[A] mere scintilla of evidence" is insufficient to satisfy this burden. Kesinger ex

AO 72A
(Rev. 8/82)

rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004).  On this motion, the Court views the facts in the light most favorable to the nonmovant.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

## QUALIFIED IMMUNITY

Before considering the merits of Plaintiffs' § 1983 claims (Counts One and Two), the Court must first assess whether the Defendants against whom these claims were asserted, Bernard Cooks and Randy T. Harkleroad,[3] are entitled to qualified immunity.

Qualified immunity exists to encourage law-enforcement officials to perform their duties appropriately without fear of personal liability or harassing litigation.  Oliver v. Fiorino, 586 F.3d 898, 904 (11th Cir. 2009) (citing Anderson v. Creighton, 483 U.S. 635, 638-39 (1987)); see also id. ("[Qualified immunity] 'protect[s] from suit all but the plainly incompetent or one who is knowingly violating federal law.' "

---

[3] Plaintiffs initially also asserted these claims against Sheriff Richard Foskey and Chief of Police Tom Taggart in their individual capacities.  First Am. Compl. Counts One, Two, ECF No. 44.  In their Response to Defendants' Motion for Summary Judgment, however, Plaintiffs withdrew any claim that Foskey and Taggart were personally liable for any constitutional violations committed by Cooks and Harkleroad.  Resp. 25, ECF No. 75.  Though Plaintiffs named Richard Foskey and Tom Taggart in the case caption in both their official and individual capacities, Plaintiffs specify in both the title of Count I and the allegations therein that they assert this claim against Foskey and Taggart "in their individual capacities."  See Am. Compl. ¶ 76, ECF No. 44 (emphasis added).  Thus, because Plaintiffs in their Response effectively withdrew their claims against Foskey and Taggart in their personal or individual capacities, there is no remaining § 1983 claim for denial of medical care against Foskey and Taggart.

(quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002))).
Nonetheless, qualified immunity is not absolute, and two primary
requirements must be satisfied for it to protect an officer from
suit.  First, the officer must have been "acting within his
discretionary authority."  Garczynski v. Bradshaw, 573 F.3d
1158, 1166 (11th Cir. 2009).  Second, his conduct must not have
violated 'clearly established statutory or constitutional rights
of which a reasonable person would have known.' "  Id. (citing
Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291 (11th Cir.
2009)).  The Court may decide these two questions in any order.
Oliver, 586 F.3d at 905.


**DISCUSSION**

Two Plaintiffs, both individually and one also as
administrator of Allen's estate, raised six claims, each against
a different combination of the six named defendants.  Mindful of
the Eleventh Circuit's command to "definitively identif[y] the
parties' claims and defenses and . . . squeeze[ ] the case down
to its bare essentials," Davis v. Coca-Cola Bottling Co.
Consol., 516 F.3d 955, 982 (11th Cir. 2008), the undersigned has
attempted to address each possible claim combination below.  Two

AO 72A
(Rev. 8/82)

defendants, Bacon County Sheriff Richard Foskey and Alma Chief of Police Tom Taggart, are subject to early dismissal.[4]

**I.   Count One: § 1983 Claim for Denial of Medical Care**

   ***Qualified Immunity***

   **A.   Were the Defendants Acting Within Their Discretionary Authority?**

   The first prong of the two-part analysis is satisfied. A police officer's official responsibilities include making arrests. See Crosby v. Monroe Cnty., 394 F.3d 1328, 1332 (11th Cir. 2004) (finding that a sheriff's deputy was performing a discretionary function when he arrested plaintiff "[b]ecause making an arrest is within the official responsibilities of a sheriff's deputy"). Cooks and Harkleroad, therefore, were performing discretionary functions when they decided to arrest Allen, carried out the arrest, and transported him to the jail.

   **B.   Did Defendants' Conduct Violate a Clearly Established Statutory or Constitutional Right of Which a Reasonable Person Would Have Known?**

   A pretrial detainee has a constitutional right under the Fourteenth Amendment[5] to have basic human needs met, such as medical care. Gary v. Modena, 244 F. App'x 997, 999 (11th Cir.

---

[4] See supra note 3.
[5] The Fourteenth Amendment governs claims for denial of medical care brought by pretrial detainees, whereas the Eighth Amendment governs such claims brought by convicted prisoners. See Gary v. Modena, 244 F. App'x 997, 999 (11th Cir. 2007).

AO 72A
(Rev. 8/82)

2007).  If there was clearly established case law as of May 9,
2007 holding that Defendants Cooks's and Harkleroad's conduct
amounted to a denial of medical care in violation of Allen's
constitutional rights, they are not entitled to qualified
immunity.  In determining whether there is clearly established
pertinent law, the Court "look[s] to decisions of the U.S.
Supreme Court, the United States Court of Appeals for the
Eleventh Circuit, and the highest court of the pertinent state."
Marsh v. Butler Cnty., 268 F.3d 1014, 1033 n.10 (11th Cir.
2001).  "A precedent with materially similar facts is not always
required; but for a federal right to be clearly established, the
applicable law 'must be sufficiently clear that a reasonable
official would understand that what he is doing violates that
right.' "  Cagle v. Sutherland, 334 F.3d 980, 990 n.15 (11th
Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).

        Plaintiffs do not specifically address Defendants'
qualified immunity from suit on Count I.[6]  Plaintiffs simply
contend that Defendants should have sought immediate medical
attention for Allen because he was a "high-risk subject" on whom
they used a taser, and further, that "upon finding Allen

---

[6] In their Response, Plaintiffs make only two summary statements regarding
qualified immunity, neither of which address the denial-of-medical-care claim
or the objective-reasonableness standard, but mention only the excessive-
force claim.  See Resp. 25 ("For the same reason that defendants are not
entitled to summary judgment on the issue of excessive force, they are not
entitled to qualified immunity.  Under Oliver v. Fiorino, 586 F.3d 898 (11th
Cir. 2009) they knew their conduct was illegal.").

AO 72A
(Rev. 8/82)

unconscious" when they arrived at the jail, they "ignored the medical emergency which Allen's condition presented and failed to initiate life-saving methods, such as CPR, in a timely and meaningful manner." First Am. Compl. ¶¶ 71, 73, ECF No. 44. Plaintiffs may be implying that Defendants are not entitled to qualified immunity because they did not immediately perform CPR on Allen. However, Plaintiffs have offered no case law — and the Court can find none — that would have put Defendants on notice that their failure to do so was a constitutional violation.

Defendants did not learn that Allen was unconscious until their arrival at the jail. Plaintiffs and Defendants dispute the chronology of events occurring upon and after Cooks's arrival at the jail with Allen. The Court views the facts in the light most favorable to Plaintiffs: Upon learning Allen was unconscious, Defendants first tried to rouse him with ammonia capsules and then checked for a pulse. They then asked an EMT to check for a pulse. When the EMT could not find a pulse, Cooks began to perform CPR on Allen. Then, Allen was transported to a hospital via ambulance. First Am. Compl. ¶¶ 49-58, ECF No. 44. According to the 911 log, Cooks arrived at the jail complex at 2:50 a.m. and requested EMT assistance at 2:56 a.m. See Resp. 4.

AO 72A
(Rev. 8/82)

Thus, the question for this Court is: Did Defendants Cooks and Harkleroad violate Allen's clearly established constitutional right to medical care by (1) first, trying to rouse him with ammonia, (2) then checking his pulse, (3) then seeking EMT assistance in checking his pulse, and (4) finally, beginning to perform CPR?  The Court finds no relevant case law that clearly establishes that Defendants' actions in seeking EMT treatment or performing CPR was objectively unreasonable and violated Allen's constitutional rights.  Significantly, Plaintiffs themselves allege that a maximum of only six minutes passed between the moment that (1) Cooks and Harkleroad learned Allen was unconscious, and (2) Cooks and Harkleroad sought EMT assistance and then began performing CPR on Allen.

This Court does not imply that a six-minute delay in medical care is per se reasonable or unreasonable, but simply that there was no clearly established case law on May 9, 2007 that would have given a reasonable officer in Defendants' position reason to believe he was violating Allen's constitutional rights.  Case law regarding § 1983 claims for denial of medical care does not clearly alert[7] law-enforcement officials that a delay of six or fewer minutes in medical treatment after an official has unsuccessfully tried to awaken

---

[7] See Harris v. Coweta Cnty., 21 F.3d 388, 393 (11th Cir. 1994) ("For purposes of qualified immunity, [ ] the pre-existing law must give officials some sense of what amount of time constitutes actionable delay in order for the law to be established with the particularity required . . . .").

the detainee is patently violative of the detainee's Fourteenth
Amendment rights.  Nor would the officers' conduct and delay, if
any, be manifestly unlawful to any other reasonable officer
under the circumstances.

Though Plaintiffs imply that Defendants Cooks and
Harkleroad should have immediately performed CPR, rather than
using ammonia or repeatedly checking for a pulse, "[t]he best
response to a serious medical need is not required by federal
law in these cases." Youmans v. Gagnon, ___ F.3d ___, No. 09-
15113, 2010 WL 4608409, at *4 (11th Cir. Nov. 16, 2010).
Judicial opinions on denial of medical care are highly fact-
specific.  Nonetheless, some generalized principles can be
gleaned: "lengthy delays are often inexcusable; shorter delays
may also constitute a constitutional violation if injuries are
sufficiently serious; and the reason for the delay must weigh in
the inquiry." Id.; see also Harris, 21 F.3d at 393-94 ("The
tolerable length of delay in providing medical attention depends
on the nature of the medical need and the reason for the
delay.").

Eleventh Circuit precedent does not clearly establish that
Defendants' alleged delay in providing Allen with medical care
was unconstitutional.  In Youmans, where the plaintiff was
beaten by police officers and "had visible abrasions on his
head, face, shoulder, elbow, and hand," the Eleventh Circuit

13

held that "it was not already clearly established as a matter of law in June 2007 that a four-hour delay for injuries of this kind violated the Fourteenth Amendment." 2010 WL 4608409, at *1, *4.

By contrast, in Bozeman v. Orum, the Eleventh Circuit found that the officers' delay in providing medical care to pretrial detainee Mario Haggard constituted deliberate indifference. According to the Court, a jury could find from the evidence that Haggard was unconscious and not breathing while being carried by the officers down a jail corridor. 422 F.3d 1265, 1273 (11th Cir. 2005). In that case, the officers "physically handled Haggard for about fourteen minutes," and it was evident from a videotape that during at least a portion of this time, "Haggard was motionless with his head dangling." Id. In finding that the officers were deliberately indifferent to Haggard's serious medical needs, the court emphasized that the officers knew Haggard was unconscious and not breathing but nevertheless failed to do anything to help him. Id. The court also noted the lack of any reason for those officers' delay. Id.

The present case is factually distinct from Bozeman.[8] Here, Defendant Cooks had no reason to believe Allen was unconscious during the ride to the jail. In fact, Allen was awake and asked

---

[8] As the Eleventh Circuit has noted, "the threshold of deliberate indifference is connected to combinations of diverse interdependent factual elements." Youmans, 2010 4608409, at *4.

AO 72A
(Rev. 8/82)

Cooks how long it would take to get to the jail.  Mot. Summ. J. 7 (citing Cooks's deposition).  Thus, any delay in learning Allen was unconscious was truly *de minimis*.  Allen's unconsciousness was not clearly apparent to Cooks, as Haggard's unconsciousness was to the officers in <u>Bozeman</u>, and as soon as Cooks learned of Allen's unconsciousness, he and Harkleroad commenced efforts to revive him.  Furthermore, during the alleged delay, the officers were not ignoring Allen's medical needs like the officers in <u>Bozeman</u> — instead, they were trying to revive Allen and asking for EMT assistance.  Given the length of and reason for the delay in this case, there was no precedent putting Defendants on notice that their actions were clearly unconstitutional.  Defendants did not violate any clearly established right with their (at most) six-minute delay.  Accordingly, they are entitled to qualified immunity on Plaintiffs' § 1983 claim for denial of medical care.  Summary judgment is proper as to Count One.

## II.  Count Two: § 1983 Claim for Excessive Force

### *Qualified Immunity*

#### A.  Were Defendants Acting Within Their Discretionary Authority?

For the same reasons stated with regard to Count One, this requirement is met.  Defendants Cooks and Harkleroad were

AO 72A
(Rev. 8/82)

performing discretionary functions in deciding and attempting to arrest Chris Allen.

**B.    Did Defendants' Conduct Violate a Clearly Established Statutory or Constitutional Right of Which a Reasonable Person Would Have Known?**

    **1.   Was There a Violation of a Constitutional Right?**

Plaintiffs contend that Defendants Cooks and Harkleroad violated Chris Allen's Fourth Amendment right to be free from the use of excessive force during an arrest. See Oliver, 586 F.3d at 905 (noting that the Fourth Amendment encompasses this right). The Fourth Amendment's objective-reasonableness standard applies to this claim. Glenn v. City of Columbus, 375 F. App'x 928, 932 (11th Cir. 2010). Not all force is excessive; "[i]t is axiomatic that the 'right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.' " Brooks v. Clayton Cnty., No. 1:07-CV-0555, 2010 WL 425949, at *9 (N.D. Ga. Feb. 19, 2009) (citing Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir. 2002)). A determination of the reasonableness of force used must consider the specific circumstances facing the law-enforcement officials at the time, as well as their frequent need to make "split-second decisions." Id. (citing Jackson v. Sauls, 206 F.3d 1156, 1171-72 (11th Cir. 2000)). This determination views the officers' actions " 'from

16

the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " Oliver, 586 F.3d at 905 (citing Kesinger, 381 F.3d at 1249).

The reasonableness determination involves analysis of a number of factors, as well as a balancing of the individual's rights against the government's interests.   See id.  The amount of force that Defendants used must be measured against three factors: "the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight."  Id.  The Court must also balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " against the government's interests in carrying out arrests efficiently and safely.  See id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).

### a.   Severity of the Crime

The first factor — the severity of the crime — weighs in Plaintiffs' favor.  Defendant Cooks did not go to Allen's residence to apprehend him for a crime; instead, it was Allen who called 911 three times, asking for assistance.  First. Am. Compl. ¶¶ 16-18, ECF No. 44.  The crime that precipitated Defendants' use of force was Allen's failure to place both hands behind his back.  For the purposes of resolving the present

17

motion, the relative severity of this conduct does not support the amount of force used.

### b.    Immediacy of Threat

Analysis of the second factor — whether the suspect posed an immediate threat to the officers' or others' safety — is less definitive, but ultimately lends support to Plaintiffs' case. Plaintiffs admit that Allen, who was yelling nonsensical things and was soaking wet with perspiration, did stick his head inside Cooks's patrol car and later crawl on the ground toward Cooks. Cooks may have interpreted this as a threat to his safety, but in response simply called for back-up.  No force was used until more than ten minutes later, after Harkleroad had arrived. First Am. Compl. ¶¶ 31, 35, ECF No. 44.  Before Harkleroad arrived, all Cooks did was advise Allen "to calm down, to lay down and to be still."  Id. ¶ 34.  If the officer had perceived an immediate threat necessitating the use of force, he would have employed force when faced with that threat, rather than waiting until the suspect had become largely compliant.

It was not until Harkleroad's arrival that Cooks told Harkleroad that Allen needed to be arrested, and instructed Allen to place his hands behind his back.  Id. ¶¶ 36, 37.  At this point, Allen remained on the ground.  Id. ¶ 37.  When Allen attempted to rise one time, Cooks instructed him to lay down, and he complied.  Id. ¶¶ 40-42.  Allen's only persistent

18

noncompliance was his failure to place one hand behind his back (he had complied in part by placing the other hand behind his back). Id. ¶¶ 38, 42. For the purposes of considering the present motion, this failure of Allen to place his other hand behind his back does not indicate that the officers faced an immediate threat to their safety, such that use of the amount and type of force was proper. It should be noted that all indications are that Allen remained on the ground, complying with Defendants' instructions to do so. As for the safety of others, there were no other persons visible to the officers during the incident. Even if there were others inside the residence, at the time Defendants used force on Allen, Allen was lying on the ground, motionless — i.e., not posing an immediate threat to the safety of any individuals potentially inside the home.

### c.   **Actively Resisting Arrest**

The third factor — whether the suspect actively resisted arrest or attempted to evade arrest by flight — also weighs in Plaintiffs' favor. It is undisputed that Allen did not attempt to flee the scene to evade arrest. Defendants contend, however, that Allen actively resisted arrest in that "he repeatedly refused (even *after* being tased) to place his hands behind his back." Mot. Summ. J. 16. Where courts have found that suspects actively resisted arrest, their conduct was much more combative

19

and required force to restrain them.  For example, in <u>Barnett v.
City of Florence, Alabama</u>, the Eleventh Circuit found that the
suspect was actively resisting arrest where he "was cursing and
combative" — "so combative during the pat down that he had to be
physically restrained" — and even continued to resist "[a]fter
being pushed against the police car."  No. 09-16000, 2010 WL
4864582, at *1-2 (11th Cir. Dec. 1, 2010); <u>see also</u> <u>Mann v.
Taser Int'l, Inc.</u>, 588 F.3d 1291, 1306 (11th Cir.2009) (finding
use of taser appropriate where plaintiff "actively resisted the
deputies' efforts at effectuating a lawful arrest" and her
behavior "was violent, aggressive and prolonged and the evidence
demonstrates that she was clearly a danger to herself and
others").

Allen's actions can be more properly characterized as
passively, rather than actively, resisting arrest.  Allen did
attempt to rise after being advised to lie down the first time,
but after a second instruction to lie down, Allen remained on
the ground.  First Am. Compl. ¶¶ 37, 40, 41-42, ECF No. 44.
Allen's sole, short-lived attempt to move from the ground does
not rise to the level of "actively" resisting arrest.  Nor does
his refusal, for whatever reason, to place his left hand behind
his back.

AO 72A
(Rev. 8/82)

### d.    Balancing of Interests

Furthermore, the government's interest in carrying out an arrest does not justify Defendants' significant intrusion on Allen's Fourth Amendment rights to be free from excessive force. Certainly, law-enforcement officials have a legitimate interest in getting suspects to comply so that they may arrest them, but that interest does not override the "nature and quality"[9] of the intrusion in this case.   Viewing the facts in the light most favorable to Plaintiffs, Defendants tased Allen eighteen times over a relatively short time period.   Even if Defendants' version were true, they tased Allen at least six times.   Mot. Summ. J. 7.   Though the Eleventh Circuit has held that a *single* use of a taser gun was reasonably proportionate to effectuate an arrest in a difficult, tense, and uncertain situation, see Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004), a jury could find that the *repeated* tasering of Allen was disproportionate to the actual need for force under the circumstances and was thus unreasonable.

### 2.    Was the Right Clearly Established?

A right is generally considered "clearly established" based on relevant case law in existence at the time of the incident, as discussed supra.   Viewing the facts in a light most favorable to the Plaintiffs, a reasonable officer in Defendants' position

---

[9] See Oliver, 586 F.3d at 905.

would have known that his conduct violated Allen's clearly established rights.  The Eleventh Circuit's recent decision in Oliver v. Fiorino clarifies that, as far back as 2004, it was clearly established that it is unlawful to employ force as disproportionate as Plaintiffs maintain was used in the present case.  See 586 F.3d 898.

In Oliver, the officer noticed a man, Oliver, standing in a median and attempting to flag her down on May 13, 2004.  Id. at 901.  When the officer stopped her vehicle, Oliver knocked on the rear driver-side window and tried unsuccessfully to open a locked door.  Id. at 901-02.  The officer instructed Oliver over her loud speaker to move to the front of the vehicle, and he complied.  Id. at 902.  She then instructed him to move further away, and he again complied.  Id.  She then exited her vehicle, at which point Oliver was standing about twenty-three feet away from her.  She pulled out her taser gun and asked Oliver what the problem was.  At some point, Oliver started to approach her.  She raised her taser and told him to step away.  He complied.  She eventually called for back-up.  The back-up officer soon arrived and attempted to move Oliver across the street.  Oliver struggled and pulled away.  The back-up officer held on to Oliver's shirt as Oliver attempted to walk away across the street, but Oliver never tried to touch or assault him.

22

Nevertheless, the initial officer tased Oliver and continued to do so.  Id. at 902-03.

The officer believed she tased Oliver approximately eleven or twelve times.  Her taser log indicated that she tased Oliver a total of eight times over a two-minute period.  By the last tase, Oliver was lying flat and did not get up from the ground.  Oliver began foaming at the mouth and screaming in pain.  Id. at 904.  The officer tried unsuccessfully to remove some of the taser prongs from Oliver's body.[10]  Id.  Paramedics transported Oliver to a hospital, where he was pronounced dead.  Id.  In both Oliver's and Allen's cases, cocaine was found in the decedents' systems, but the plaintiffs offered expert witnesses who opined that the deaths were caused, at least in part, by applications of the tasers.  Id.  The Eleventh Circuit affirmed the district court's denial of qualified immunity to the officers in Oliver.  The Court stated, "[T]he force employed was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that

---

[10] The Oliver court did not address the distinction between the dart and drive-stun modes of taser usage, but stated: "Fiorino was using a [taser] which was designed to cause significant, uncontrollable muscle contractions . . . .  The [T]aser gun fires two probes up to a distance of twenty-one feet . . . .  These probes are connected to the [T]aser gun by high-voltage insulated wire.  When the probes make contact with the target, the [T]aser gun transmits electrical pulses along the wires and into the body of the target, through up to two inches of clothing.  The pulses are five seconds in duration, unless the trigger is held down longer than five seconds."  586 F.3d at 903 (quotation marks and internal citations omitted).

his actions were unlawful.  The need for force was exceedingly limited." Id. at 908.

The Eleventh Circuit's reasoning can be applied with equal force to the present, closely analogous case.  The Eleventh Circuit relied on the facts that "Oliver was not accused of or suspected of any crime, let alone a violent one; he did not act belligerently or aggressively; he complied with most of the officers' directions; and he made no effort to flee." Id. These exact observations can also be made about Allen's conduct. In Oliver, the court found that "[t]asering the plaintiff at least eight and as many as eleven or twelve times over a two-minute span without attempting to arrest or otherwise subdue plaintiff" was "so plainly unnecessary and disproportionate that no reasonable officer could have thought that this amount of force was legal under the circumstances." Id.  For similar reasons, Defendants are not entitled to qualified immunity in this case.

## III. Count Two: § 1983 Claim for Excessive Force

### Merits

A Fourth Amendment excessive-force claim necessitates a determination of whether the force used was objectively reasonable.  Relevant to this determination is "(1) the need for the application of force, (2) the relationship between the need

24

and amount of force used, and (3) the extent of the injury inflicted." Vinyard, 311 F.3d at 1347 (citations and internal quotation marks omitted).  For the reasons discussed supra, there is sufficient evidence from which a jury could find that Defendants' use of force was objectively unreasonable.  Summary judgment is therefore denied as to Plaintiffs' § 1983 claim against Cooks and Harkleroad for excessive force.

## IV.   Count Three:  Americans with Disabilities Act Claim

Plaintiffs allege that Defendants Bacon County and the City of Alma failed to comply with the Americans with Disabilities Act (ADA) in that

> they failed and refused to provide medical services to Allen because of the fact of his mental illness and/or excited delirium.  Allen was, by reason of these disabilities, excluded from and denied the benefits of medical care and treatment, and was subjected to discrimination by Bacon County and the City of Alma, through their respective agents and employees.

First Am. Compl. ¶ 18, ECF No. 45.

Plaintiffs must prove three elements to state a claim under the ADA:

> (1) that [Allen was] a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1083 (11th Cir.
2007).  Defendants concede that there is at least a question of
fact of whether the first element is satisfied — whether Allen
was a disabled individual under the meaning of the ADA.
Defendants argue that summary judgment is nevertheless proper on
the ADA claim because Allen was not "even potentially
discriminated against in violation of the ADA by the County or
City."  Mot. Summ. J. 27.

   The Eleventh Circuit has allowed a plaintiff to bring an
ADA claim arising from an arrest "under the final clause in the
Title II statute: that he was 'subjected to discrimination' by a
public entity, the police, by reason of his disability," without
"enter[ing] the circuits' debate about whether police conduct
during an arrest is a program, service, or activity covered by
the ADA."  Bircoll, 480 at 1084.  This Court likewise need not
determine whether the Defendants' conduct during the arrest was
a "program, service, or activity" as defined by the ADA, because
Plaintiffs have offered not even a scintilla of evidence to
support either the second or third elements of an ADA claim.
Plaintiffs' entire argument on this issue is limited to vague
allegations that Allen was "excluded from and denied the
benefits of medical care and treatment, and was subjected to
discrimination" by Defendants.  First Am. Compl. ¶ 18, ECF No.
45.  In response to Defendants' Motion for Summary Judgment,

AO 72A
(Rev. 8/82)

Plaintiffs do not even describe the alleged discrimination or exclusion.  Instead, they state simply that "[t]he problem is that Cooks and Harkleroad had no patience.  They had no accommodation."  Resp. 26.  Plaintiffs' ADA claim cannot survive summary judgment without their having established that some specific exclusion, denial of benefits, or discrimination occurred.  Defendants are therefore entitled to summary judgment on the ADA claim.

## V. Count Four: State-law Claims for Assault and Battery

In Count Four, Plaintiffs sue Cooks and Harkleroad for assault and battery, and the City of Alma for Harkleroad's actions under the doctrine of respondeat superior.  First Am. Compl. ¶ 101, ECF No. 45.  Defendants move for summary judgment on Count Four, arguing that (1) Cooks and Harkleroad are entitled to official immunity, and (2) even if the Court finds they are not, the level of force they used on Allen was not constitutionally excessive.  Mot. Summ. J. 30, 32.

### A.   Officers Cooks and Harkleroad

#### 1.   Official Immunity

Under Georgia law, a police officer may be personally liable for state-law torts only for discretionary acts performed with malice or an intent to injure.  See Campbell v. Goode, 695

AO 72A
(Rev. 8/82)

S.E.2d 44, 45 (Ga. Ct. App. 2010).  Otherwise, the officer is entitled to official immunity.

### a.   Discretionary Acts

Discretionary acts, as opposed to ministerial acts, warrant official immunity.  The character of the act the officer was performing determines whether the act is deemed ministerial or discretionary.  Reed v. DeKalb Cnty., 589 S.E.2d 584, 587 (Ga. Ct. App. 2003).  "[A] discretionary act 'calls for the exercise of personal deliberation and judgment, which entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.' "  Id. (citing Harvey v. Nichols, 581 S.E.2d 272, 276 (Ga. Ct. App. 2003)).  A ministerial act, on the other hand, "requir[es] merely the execution of a specific duty."  Barnard v. Turner Cnty., 701 S.E.2d 859, 862 (Ga. Ct. App. 2010) (quoting Kennedy v. Mathis, 676 S.E.2d 746, 748 (Ga. Ct. App. 2009)).  Deciding to carry out a warrantless arrest, as Defendants Cooks and Harkleroad were doing, is a discretionary act.  Reed, 589 S.E.2d at 587.

### b.   Malice or Intent to Injure

In this context, " 'actual malice' means a deliberate intent to do wrong."  Reed, 589 S.E.2d at 588.  Further, that intent must be to cause the specific harm suffered.  See Campbell, 695 S.E.2d at 46.  "[A]ctual malice" does not include " ' "implied malice," i.e., the reckless disregard for the

28

rights or safety of others.' " Barnard, 701 S.E.2d at 862 n.3
(quoting Murphy v. Bajjani, 647 S.E.2d 54, 60 (Ga. 2007)).   To
avoid summary judgment, Plaintiffs must show some evidence that
Cooks and Harkleroad acted with the deliberate intention to
cause the specific harm Allen suffered.   See id.

Here, accepting Plaintiffs' version of the facts, there is
evidence from which a jury could find that Cooks and Harkleroad
acted with actual malice in tasing Allen repeatedly.   Based on
evidence that Allen was subjected to repeated taser shocks in
the drive-stun mode while largely compliant and lying motionless
on the ground, a reasonable jury could conclude that Defendants
tased Allen to cause the harm suffered by Allen (pain, and
potentially, death) and thus acted with actual malice.   See Hill
v. Mull, 5:04-CV-329, 2006 WL 3022280, at *14 (M.D. Ga. Oct. 23,
2006) (finding that, based on plaintiff's testimony, "a
reasonable jury could not only infer that [the officer's] use of
force was unlawful, it could also infer that [the officer's]
unnecessary and excessive force demonstrated a deliberate intent
to commit wrongful acts," and thus denying official immunity);
Jackson v. City of Albany, Ga., 49 F. Supp. 2d 1374, 1381 (M.D.
Ga. 1998) (finding that the evidence viewed in favor of
plaintiffs, "[w]hether ultimately persuasive or not, [ ] could
certainly support a finding that [the officer] maliciously
intended to use excessive force on [plaintiff]" and denying

29

immunity); see also Campbell, 695 S.E.2d 44 at 49 (finding no actual malice where plaintiff actually acknowledged that he did not believe the officer intended to break plaintiff's arm). Therefore, Officers Cooks and Harkleroad are not entitled to official immunity on the assault and battery claims.

### 2.   Merits

In Georgia, "the act of intentionally causing actual physical harm to another" constitutes a battery, and "an assault occurs when all the apparent circumstances, reasonably viewed, are such as to lead a person reasonably to apprehend a violent injury from the unlawful act of another." Everett v. Goodloe, 602 S.E.2d 284, 291 (Ga. Ct. App. 2004) (alterations, internal quotation marks, and footnotes omitted). Even minimal touching will support a claim of assault and battery. Darnell v. Houston Cnty. Bd. of Ed., 506 S.E.2d 385, 388 (Ga. Ct. App. 1998) (citing Jarrett v. Butts, 379 S.E.2d 583 (1989)). As discussed supra, the evidence regarding Defendants' use of force is sufficient to create a genuine factual question for a jury as to whether Defendants committed the torts of assault and battery against Allen. Summary judgment is therefore denied to Defendants Cooks and Harkleroad on Count Four.

**B.    The City of Alma**

    **1.    Sovereign Immunity**

Plaintiffs premise their claim against the City of Alma for assault and battery solely on the actions of Defendant Harkleroad.  The City asserts the defense of sovereign immunity. Mot. Summ. J. 33 n.13.

    **a.    Respondeat Superior**

Even if the Court had found Harkleroad entitled to official immunity on the underlying claim of assault and battery, immunity is not delegable under Georgia law; Harkleroad's official immunity would not extend protection to the City from liability.  Rodriguez v. Kraus, 619 S.E.2d 800, 803 (Ga. Ct. App. 2005) (citing Gilbert v. Richardson, 452 S.E.2d 476, 753-54 (Ga. 1994)).  The City may, however, raise as a defense its own immunity from suit as a municipality.

    **b.    Grant of Sovereign Immunity**

The Georgia Constitution grants sovereign immunity to the State and all its departments and agencies unless they have waived it.  Ga. Const. art. 1, § 2, para. 9(e); see also id. art. 9, § 2, para. 9 ("The General Assembly may waive the immunity of . . . municipalities . . . by law.")  A city may not be held liable for damages for injuries arising from the performance of a governmental function, as opposed to a proprietary or ministerial function.  Weaver v. City of

31

Statesboro, 653 S.E.2d 765, 768 (Ga. Ct. App. 2007) (citing O.C.G.A. § 36-33-1(b)); Boone v. City of Columbus, 75 S.E.2d 338, 339 (Ga. Ct. App. 1953). "[I]t is well established that city police officers engaged in city police work are performing a governmental function," Weaver, 653 S.E.2d at 768, and thus the City of Alma has sovereign immunity from claims arising from police work unless it waived that immunity.

### c.   Waiver

Plaintiffs have not demonstrated that the City waived its immunity. Pursuant to statute, a city may waive sovereign immunity under certain conditions involving the purchase of liability insurance. O.C.G.A. § 36-33-1; see also Campbell, 695 S.E.2d at 46-47. The burden of showing waiver falls on Plaintiffs. See City of Lawrenceville v. Macko, 439 S.E.2d 95, 98 (Ga. Ct. App. 1993), overruled in part on other grounds by Clive v. Gregory, 635 S.E.2d 188 (Ga. Ct. App. 2006); Mot. Summ. J. 33 n.13. Plaintiffs have not met this burden; in fact, they do not address the City's immunity defense whatsoever. See Resp. The Court finds no reason why the City should not be immune from suit. Summary judgment is proper as to Plaintiffs' assault and battery claims against the City.

## VI.   Count Five: State-law Claims for Negligence, Pain and Suffering, and Wrongful Death

In Count Five, Plaintiffs sue Defendants Harkleroad and the City of Alma for negligence, pain and suffering, and wrongful death.  First Am. Compl. ¶¶ 104-108, ECF No. 45.  Specifically, Plaintiffs claim that (1) "Defendant Harkleroad failed to follow proper, recognized procedures with regard to the use of a TASER device," was "negligent in the use of the TASER on Allen," and that negligence "resulted in pain and suffering and the death of Allen;" and (2) the City is liable for Harkleroad's actions under the doctrine of respondeat superior.  Id. ¶¶ 105-107.

### A.   City of Alma

For the reasons stated supra with regard to Count Four, Defendant City of Alma is entitled to sovereign immunity from suit, and thus is entitled to summary judgment on Count Five.

### B.   Officer Harkleroad

#### 1.   Negligence

Plaintiffs have offered sufficient evidence, discussed supra, to defeat Defendant Harkleroad's claim of official immunity, as well as to defeat summary judgment on the claim that Harkleroad was negligent in the application of his taser to Allen.  Summary judgment is therefore denied as to Plaintiffs' negligence claim.

AO 72A
(Rev. 8/82)

### 2.   Pain and Suffering

As "pain and suffering" is not an independent cause of action in Georgia, but simply a phrase relevant to determination of damages, summary judgment is granted as to this claim.

### 3.   Wrongful Death

"An action for wrongful death may be premised upon 'any negligence which was actionable at common law.' " <u>Allrid v. Emory Univ.</u>, 303 S.E.2d 486, 488 (Ga. Ct. App. 1983).  Because Plaintiffs' negligence claim survives summary judgment, so too does Plaintiffs' wrongful death claim.

## VII. Count Six: State-law Claims for Violation of O.C.G.A. Sections 42-5-2 and 42-4-4

In Count Six, Plaintiffs bring claims against Defendants Cooks, Harkleroad, and the City of Alma, alleging that "[t]he actions and inactions of the defendants [ ] violated Allen's affirmative state law based right of protection against abuse while in custody, and right to receipt of medical care, including but not limited to O.C.G.A. 42-5-2 and O.C.G.A. 42-4-4."  First Am. Compl. ¶ 110, ECF No. 45.  Defendants moved for summary judgment on these claims on the grounds that (1) O.C.G.A. § 42-4-4 imposes a duty only upon sheriffs and deputies; (2) O.C.G.A. § 42-5-2 imposes a duty only on the governmental unit having physical custody of a detainee, and (3)

34

no Defendant could be liable under either statute because Allen actually received medical attention at the jail.  Mot. Summ. J. 34.  In their Response, Plaintiffs "agree that O.C.G.A. § 42-4-4 and 42-5-2 applies only to the defendant sheriff and does not oppose the grant of summary judgment as to such issues in favor of Cooks, Harkleroad or the City of Alma."  Resp. 29.  As Defendants point out, however, Plaintiffs did not state a claim against Sheriff Foskey in Count Six.  Having already amended their Complaint once and reached the summary judgment stage, Plaintiffs cannot now, in a response to a summary judgment motion, assert this claim against a Defendant not previously named in this count.

The Court agrees with Defendants' arguments about the inapplicability of the cited statutes to the Defendants actually named in Count Six (Cooks, Harkleroad, and the City).  O.C.G.A. section 42-4-4 is entitled "Duties of the sheriff [ ]" and enumerates the duties of the sheriff in relation to a jail. O.C.G.A. § 42-4-4.  O.C.G.A. section 42-5-2 lists the responsibilities of "the governmental unit, subdivision, or agency having the physical custody of an inmate."  O.C.G.A. § 42-5-2(a). As Defendants note, Allen was taken into custody by Cooks, a Bacon County police officer, and transported to the county jail.  Mot. Summ. J. 34.  Thus, Allen was never in the custody of the City of Alma, and Plaintiffs cannot bring suit

against the City under O.C.G.A. section 42-5-2.  Plaintiffs have offered no rebuttal of these arguments, but in fact concede summary judgment is proper on these claims.  Resp. 29.  The Court grants summary judgment on Count Six as to all Defendants.

**CONCLUSION**

All claims against Defendants Sheriff Foskey and Chief Taggart are hereby **DISMISSED**.

Summary judgment is hereby **GRANTED** as to Plaintiffs' § 1983 claim for denial of medical care (Count One) against Officers Cooks and Harkleroad; American with Disabilities Act claim (Count Three) against Bacon County and the City of Alma; negligence, pain and suffering, and wrongful death claims (Count Five) against the City of Alma; pain and suffering claim (Count Five) against Officer Harkleroad; and claims for violation of O.C.G.A. sections 42-5-2 and 42-4-4 (Count Six) against Cooks, Harkleroad, and the City of Alma.

Summary judgment is hereby **DENIED** as to Plaintiff's § 1983 claim for excessive force (Count Two) against Cooks and Harkleroad; assault and battery claims (Count Four) against Cooks and Harkleroad; and negligence and wrongful death claims (Count Five) against Officer Harkleroad.

AO 72A
(Rev. 8/82)

**SO ORDERED,** this 26th day of January, 2011.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)